## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA,

        Plaintiff,

     v.

THE WASHINGTON TRUST
COMPANY, OF WESTERLY,

        Defendant.

Civil Action No.

## <u>COMPLAINT</u>

1.    The United States of America (the "United States") brings this action against The Washington Trust Company, of Westerly ("Washington Trust" or the "Bank") under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, and its implementing Regulation, 12 C.F.R. § 1002.1 *et seq.* ("Regulation B") to remedy discrimination in Washington Trust's residential mortgage lending.

2.    The FHA, ECOA, and Regulation B prohibit creditors, such as banks, from discriminating in home loans and other credit services on the basis of race, color, national origin, and other characteristics.

3.    "Redlining" is one type of discrimination prohibited under the FHA, ECOA, and Regulation B. Redlining occurs when lenders discourage loan applications, deny equal access to home loans and other credit services, or avoid

1

providing home loans and other credit services to neighborhoods based on the race, color, or national origin of the residents of those neighborhoods.

4.    From 2016 through at least 2021 (the "Relevant Time Period"), Washington Trust engaged in a pattern or practice of unlawful redlining. As alleged in detail herein, Washington Trust avoided providing home loans[1] and other mortgage services in majority-Black and Hispanic neighborhoods in the State of Rhode Island.[2]

5.    Throughout the Relevant Time Period, Washington Trust's redlining practices included locating and maintaining all of its Rhode Island branches and mortgage loan officers outside of majority-Black and Hispanic neighborhoods. Washington Trust does not have, and has never had, a branch in a majority-Black and Hispanic census tract despite the fact that nearly 16 percent of the residential census tracts in the State of Rhode Island are majority-Black and Hispanic. In addition, Washington Trust relied on mortgage loan officers working out of only majority-white areas as the primary source for generating loan applications and

---

[1]    For purposes of this Complaint, the terms "mortgage loans" or "home loans" refer to all loans that Washington Trust and other creditors must report under the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801–2810, and "mortgage lending" refers to providing those loans.

[2]    A "majority-Black and Hispanic" census tract is a residential census tract where more than 50 percent of the residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau. A "majority-white" census tract is one where more than 50 percent of the residents are identified as "non-Hispanic white" by the United States Census Bureau. This Complaint uses "majority-Black and Hispanic census tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably and does the same for "majority-white tract," "majority-white area," and "majority-white neighborhood."

2

conducting outreach. Washington Trust failed to conduct outreach, marketing, and advertising of mortgage services in majority-Black and Hispanic areas, including by failing to train or incentivize its lending or marketing staff to compensate for its lack of branches and presence in majority-Black and Hispanic areas.

6.     Further, as early as 2011 and throughout the Relevant Time Period, Washington Trust was aware of its redlining risk through internal and third-party reports that identified a lack of mortgage lending activity in majority-Black and Hispanic areas and a lack of applications from Black and Hispanic borrowers. Washington Trust failed to take meaningful steps to address the redlining risk identified in these reports.

7.     As a result of the above-described practices, Washington Trust generated disproportionately low numbers of loan applications and home loans during each year in the Relevant Time Period from majority-Black and Hispanic neighborhoods in Rhode Island, as compared to similarly-situated lenders.

8.     Washington Trust's conduct and practices were intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority-Black and Hispanic neighborhoods, and otherwise discouraged those individuals from applying for home loans on the basis of the race, color, or national origin of the residents of those neighborhoods.

9.     Washington Trust's conduct was not justified by a legitimate, nondiscriminatory reason or business necessity and was not necessary to achieve a substantial, legitimate, nondiscriminatory interest.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1345, 42 U.S.C. § 3614(a), and 15 U.S.C. § 1691e(h) because the action arises under the laws of the United States, and the United States brings this case as a plaintiff.

11.     Venue is proper in the Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

12.     Plaintiff the United States brings this action to enforce the FHA and ECOA. The FHA and ECOA authorize the Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the Attorney General to bring suit where the defendant has denied rights to a group of persons and that denial raises an issue of general public importance. 42 U.S.C. § 3614(a).

13.     Defendant The Washington Trust Company, of Westerly is a state-chartered bank headquartered in Westerly, Rhode Island, and subject to the regulatory authority of the Federal Deposit Insurance Corporation ("FDIC"). Washington Trust is a subsidiary of Washington Trust Bancorp, Inc., a publicly-owned bank holding company headquartered in Westerly, Rhode Island.

14.    Founded in 1800, Washington Trust describes itself as the oldest community bank in the nation and the largest state-chartered bank headquartered in Rhode Island. Washington Trust offers personal, commercial, consumer, and mortgage banking, and wealth management and trust services.

15.    Washington Trust is a prominent residential mortgage lender in the State of Rhode Island. From 2016 through 2021, Washington Trust consistently has ranked in the top seven for lenders based on mortgage loan application volume in Rhode Island; from 2018 to 2021, the Bank ranked in the top five for lenders based on mortgage loan application volume in Rhode Island.

16.    Washington Trust currently maintains 25 branches in Rhode Island and one branch in Mystic, Connecticut.

17.    As of March 31, 2023, Washington Trust's total assets equaled approximately $6.85 billion.

18.    Washington Trust is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. pt. 100, 12 C.F.R. pt. 1002.

19.    Washington Trust is a "creditor" under ECOA, 15 U.S.C. § 1691a(e), and engaged in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

### FACTUAL ALLEGATIONS

### Washington Trust's Assessment Area

20.    As a depository bank, Washington Trust is subject to the requirements of the Community Reinvestment Act ("CRA"), 12 U.S.C. §§ 2901–2908, and its

enabling regulations, which require most banks to meet the credit needs of the communities that they serve. Each bank subject to the CRA self-identifies the communities that it serves in the bank's "assessment area." Federal regulators look at a bank's assessment area in evaluating whether an institution is meeting the credit needs of its entire community.

21.    Since at least 2016, Washington Trust has self-designated its CRA assessment area to comprise the entirety of all five counties in the State of Rhode Island: Bristol, Kent, Newport, Providence, and Washington Counties (hereinafter "Rhode Island" or "CRA assessment area"). *See* **Exhibit A**.

22.    The Bank has self-designated the City of Providence as part of its CRA assessment area since at least 2012. By at least 2016, the Bank had added Providence County in its entirety, including the cities of Pawtucket and Central Falls, to its CRA assessment area.

23.    Rhode Island has a population of more than 1.05 million; of this population, 72 percent are white, 15 percent are Hispanic or Latino, six percent are Black, and three percent are Asian. In other words, 21 percent of the population of the Bank's CRA assessment area is Black or Hispanic.[3]

24.    Rhode Island is comprised of 244 census tracts, of which 193 (79.1 percent) are majority-white and 38 (15.8 percent) are majority-Black and Hispanic.[4]

---

[3]    Demographic information in paragraphs 23-26 is based on 2019 American Community Survey data published by the United States Census Bureau.

[4]    Of the remaining 13 census tracts, four do not have any population and nine (3.75 percent) are "majority-minority," meaning more than 50 percent of the residents

25.    Providence County contains all the majority-Black and Hispanic neighborhoods in Rhode Island and 88.3 percent of the total Black and Hispanic population in Rhode Island.

26.    Bristol, Kent, Newport, and Washington Counties each have populations that are over 86 percent white, while Providence County's population is 61 percent white.[5]

## Washington Trust's Branches Were Located Exclusively in Majority-White Neighborhoods

27.    During the Relevant Time Period, Washington Trust operated between 20 and 23 branches in Rhode Island.[6] All of those branches were "full-service" branches, which offered the full suite of Washington Trust's retail products and services, including accepting residential mortgage loan inquiries and applications.

28.    Since its founding and continuing through the present, Washington Trust has not located a single branch in a majority-Black and Hispanic census tract, even though those census tracts represent almost 16 percent of the overall census tracts in Rhode Island. *See* **Exhibit B**.

29.    Although Washington Trust is historically a Washington County-based bank, the Bank has expanded out of Washington County and established a physical

---

are identified as non-white, but less than 50 percent are Black or Hispanic, as identified by the United States Census Bureau.

[5]    Washington and Bristol Counties are 91 percent white, Kent County is 88 percent white, and Newport County is 86 percent white.

[6]    Washington Trust opened its twenty-fourth branch in Rhode Island in 2022 and then opened its twenty-fifth branch in Rhode Island in 2023.

presence in Providence and Kent Counties by opening twelve branches since 2002. The Bank avoided placing any of these new branches in a majority-Black and Hispanic census tract.

30.     Currently, ten of Washington Trust's branches are located in Providence County. Even though Washington Trust added the entirety of Providence County to its assessment area by 2016, and despite the fact that Providence County contains all of the majority-Black and Hispanic census tracts in Rhode Island, Washington Trust did not locate a single branch in a majority-Black and Hispanic census tract; instead, Washington Trust continued to locate its branches to serve the credit needs of the majority-white communities in Providence, Kent, Bristol, and Washington Counties.

31.     The Bank opened four new branches during the Relevant Time Period, and all of those branches were placed in majority-white areas; the Bank did not include proximity to majority-Black and Hispanic neighborhoods as a consideration when expanding its branch network. In August 2022, the Bank opened its twenty-fourth branch in Rhode Island and in April 2023, the Bank opened its twenty-fifth branch in Rhode Island, and located both branches in majority-white areas.

32.     During the Relevant Time Period, Washington Trust located its branches to serve the credit needs of residents in majority-white neighborhoods and to avoid serving the credit needs of residents in majority-Black and Hispanic neighborhoods.

33.    Washington Trust knew its branches were not serving the credit needs of majority-Black and Hispanic areas in Rhode Island, but did not take steps to address this failure for years.

34.    By concentrating its branches in majority-white areas, Washington Trust discouraged residents of majority-Black and Hispanic areas from applying for and obtaining home loans from Washington Trust and restricted their access to the Bank's credit and mortgage lending services.

**Washington Trust Failed to Advertise or Conduct Outreach to Majority-Black and Hispanic Neighborhoods and Relied Solely on Mortgage Loan Officers Serving Majority-White Neighborhoods to Generate Mortgage Loan Applications**

35.    During the Relevant Time Period, Washington Trust's mortgage loan officers served the credit needs of majority-white neighborhoods but did not serve the credit needs of majority-Black and Hispanic neighborhoods.

36.    Washington Trust relied primarily on its mortgage loan officers to generate residential mortgage loan applications and cultivate relationships to serve the credit needs of residents in its Rhode Island assessment area.

37.    During the Relevant Time Period, the Bank assigned all of its mortgage loan officers to its branch locations, which are all located outside of majority-Black and Hispanic areas; it did not assign a single mortgage loan officer to conduct outreach, market, advertise, or generate loans from majority-Black and Hispanic neighborhoods.

38.    In the majority-white neighborhoods in Rhode Island where mortgage loan officers were assigned to branches, mortgage-lending services were available to

walk-in prospective applicants. Because there were no Washington Trust branches in majority-Black and Hispanic neighborhoods, these services were not as easily available to the residents of such neighborhoods, as those residents had to travel to majority-white neighborhoods where Washington Trust branches are located.

39.    During the Relevant Time Period, Washington Trust relied almost entirely on mortgage loan officers—all of whom were assigned to branches in majority-white neighborhoods—to develop referral sources and conduct outreach to potential customers, as well as to distribute marketing materials related to the Bank's mortgage lending services.

40.    Washington Trust neither monitored nor documented where or to whom its mortgage loan officers distributed marketing or outreach materials related to mortgage lending services to ensure that such distribution occurred in all neighborhoods throughout Rhode Island.

41.    During the Relevant Time Period, Washington Trust took no actions to train or incentivize its mortgage loan officers to compensate for its lack of branches and serve residents in majority-Black and Hispanic neighborhoods.

42.    The Bank took no meaningful steps, apart from any isolated steps voluntarily taken by any of its mortgage loan officers, to generate mortgage loan applications from majority-Black and Hispanic areas in Rhode Island.

43.    Washington Trust's marketing strategy was focused primarily on statewide "brand messaging" or generic advertising emphasizing Washington Trust's "brand" as a full-service community bank.

44.    As early as 2011, Washington Trust's internal and third-party risk assessment reports warned that its volume of mortgage loan applications and originations in majority-minority areas was low and recommended that the Bank "develop a comprehensive marketing campaign to encourage both Hispanic and Black consumers."

45.    A 2011 third-party risk assessment report noted that "the [B]ank could not market in Spanish, as [Washington Trust] did not have [a] sufficient amount of Spanish speaking employees." The report stated that the "Bank is aware that outreach is low for the Hispanic population[.]"

46.    Despite this 2011 report and subsequent reports in later years that highlighted the Bank's redlining risk, Washington Trust's marketing strategy focused on raising brand awareness and failed to include any efforts to market and advertise to majority-Black or Hispanic areas.

47.    Despite operating in a CRA assessment area where over 15 percent of the population is Hispanic, during the Relevant Time Period, Washington Trust did not translate its full website into Spanish, and had all of its Spanish content on one page, compared to the several dozens of pages of content available in English.

48.    Similarly, during the Relevant Time Period, only two of the mortgage loan officers employed by Washington Trust spoke Spanish fluently, with one leaving the position after serving less than one year. As a result, the vast majority of Washington Trust's mortgage loan officers were unable to provide credit services to Spanish-speaking applicants and prospective applicants.

49.    Washington Trust's failure to assign any mortgage loan officers to majority-Black and Hispanic areas, and failure to take any meaningful efforts to compensate for its lack of branches and mortgage loan officers in majority-Black and Hispanic neighborhoods, was intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority-Black and Hispanic neighborhoods in its assessment area.

### Disproportionately Low Numbers of Home Loan Applications from Majority-Black and Hispanic Neighborhoods

50.    Washington Trust's lending demonstrated a pattern of disproportionately failing to serve majority-Black and Hispanic neighborhoods in Rhode Island, when compared with its peer lenders.

51.    Washington Trust's policies and practices alleged herein—including the concentration of all its branches, mortgage loan officers, marketing, and outreach in majority-white neighborhoods—have discriminated against and discouraged applicants and prospective applicants in majority-Black and Hispanic neighborhoods in Rhode Island from applying for and obtaining home loans and other mortgage-related services.

52.    Washington Trust's own data on loan applications and originations that it is required to report to regulators under HMDA confirm that Washington Trust avoided serving majority-Black and Hispanic neighborhoods in Rhode Island. *See* **Exhibits C, D**.

53.    From 2016 through 2021, Washington Trust significantly underperformed its "peer lenders" in generating home mortgage applications from

majority-Black and Hispanic neighborhoods in Rhode Island. "Peer lenders" are similarly-situated financial institutions that received between 50 percent and 200 percent of the Bank's annual volume of home mortgage loan applications.

54.     The disparity between the rate of applications generated by Washington Trust and the rate generated by its peer lenders from majority-Black and Hispanic neighborhoods is both statistically significant—meaning unlikely to be caused by chance—and sizable in every year from 2016 through 2021.

55.     Specifically, of the 10,505 HMDA-reportable mortgage applications Washington Trust generated from 2016 through 2021 in its assessment area, only 255, or 2.4 percent, came from residents of, or for properties located in, majority-Black and Hispanic areas. By contrast, during the same time period, Washington Trust's peers generated 9.5 percent of their HMDA applications from these same majority-Black and Hispanic neighborhoods. These disparities are statistically significant across the six-year period and in every year analyzed.

56.     In other words, from 2016 through 2021, Washington Trust's peer lenders generated applications from majority-Black and Hispanic areas at nearly four times the rate of Washington Trust.

57.     The statistically significant disparities between applications Washington Trust generated from majority-Black and Hispanic neighborhoods and those that its peers generated show that there were significant numbers of residents in majority-Black and Hispanic areas in Rhode Island who were seeking home loans.

Washington Trust had no legitimate, non-discriminatory reason to draw so few applications from these areas.

58.    The data show a statistically significant failure by Washington Trust, relative to its peer lenders, to draw applications for home loans and provide residential mortgage services to residents in majority-Black and Hispanic neighborhoods on a non-discriminatory basis from 2016 through 2021.

59.    During the Relevant Time Period, even when Washington Trust generated applications from majority-Black and Hispanic areas, the applicants themselves were disproportionately white. For applications Washington Trust generated in majority-Black and Hispanic census tracts, on average, 46.5 percent of the applications were made by white applicants. By contrast, during the same time period, when Washington Trust's peers generated applications from majority-Black and Hispanic areas, on average, only 25 percent of the applications came from white applicants.

**Disproportionately Low Numbers of Home Loans Made to Applicants in Majority-Black and Hispanic Neighborhoods**

60.    Washington Trust's lending practices have discouraged prospective applicants in majority-Black and Hispanic neighborhoods from seeking home loans. As a result, the bank made a smaller percentage of HMDA-reportable residential mortgage loans in these neighborhoods compared to its peers from 2016 through 2021.

61.    The disparity between the rate of home loans that Washington Trust made and the rate made by its peer lenders in majority-Black and Hispanic

neighborhoods was both statistically significant and sizable in every year from 2016 through 2021.

62.    Specifically, of the 7,502 HMDA-reportable residential mortgage loans Washington Trust made from 2016 through 2021 in its assessment area, only 142, or 1.9 percent came from residents of, or for properties located in, majority-Black and Hispanic areas. By contrast, Washington Trust's peers made 7.9 percent of their HMDA loans from these same majority-Black and Hispanic neighborhoods.

63.    In other words, from 2016 through 2021, Washington Trust's peer lenders made home loans in majority-Black and Hispanic areas at more than four times the rate of Washington Trust.

64.    These disparities are statistically significant across the six-year period and in every year analyzed.

65.    The level of lending by Washington Trust's peers demonstrates that there were thousands of qualified borrowers for home loans and sufficient mortgage loan demand in majority-Black and Hispanic neighborhoods in the State of Rhode Island. Washington Trust had no legitimate, non-discriminatory reason to originate so few loans from these areas.

66.    The data show a statistically significant failure by Washington Trust to make home loans and provide residential mortgage services to qualified applicants in majority-Black and Hispanic neighborhoods on a non-discriminatory basis when compared with similarly-situated lenders from 2016 to 2021.

67.    From 2016 to 2021, even when Washington Trust made loans in majority-Black and Hispanic areas, the loans themselves were disproportionately made to white borrowers. For loans Washington Trust made in majority-Black and Hispanic census tracts, on average, 50 percent of the loans were made to white borrowers. By contrast, during the same time period, when Washington Trust's peers made loans in majority-Black and Hispanic areas, on average, only 29 percent of the loans went to white borrowers.

### Failure to Address Redlining Risk Identified by its Compliance Department

68.    As early as 2011 and continuing throughout the Relevant Time Period, Washington Trust was aware that its operations were creating a risk of redlining. Reports from third-party vendors Washington Trust engaged to report on its fair lending performance, as well as reports from the Bank's Compliance Department, consistently informed Washington Trust that its application volume from Black and Hispanic potential borrowers, as well as from majority-minority areas, was low relative to the overall population in Rhode Island.

69.    Washington Trust took no meaningful action in response to these reports indicating that it was underserving Black and Hispanic borrowers and majority-Black and Hispanic neighborhoods, despite having knowledge of its underperformance and its redlining risk.

70.    When Washington Trust purportedly attempted to take measures to address its redlining risk, such as developing a loan product for low-to-moderate income borrowers, the Bank failed to adequately monitor, document, or evaluate

whether such measures ensured that the Bank was providing equal access to credit to majority-Black and Hispanic neighborhoods in Rhode Island. In fact, the data showing Washington Trust failed both to draw applications for and to provide home loans and residential mortgage services to residents in majority-Black and Hispanic neighborhoods demonstrate that the Bank failed to serve those portions of its assessment area.

### The United States' Investigation

71.    On November 19, 2021, the United States notified Washington Trust that it was opening an investigation into whether the Bank had engaged in unlawful redlining in violation of the FHA and ECOA.

72.    Through that investigation, the United States determined that Washington Trust's discriminatory practices, as described herein, were intended to discriminate and discourage, and had the effect of discriminating and discouraging, on the basis of race, color or national origin.

### COUNT I: VIOLATIONS OF THE FAIR HOUSING ACT

73.    The United States incorporates all prior Paragraphs of the Complaint as if fully set forth herein.

74.    Washington Trust's policies and practices constitute the unlawful redlining of majority-Black and Hispanic communities in its Community Reinvestment Act assessment area, the State of Rhode Island, on account of the racial, color, and national origin composition of those communities. Washington Trust's policies and practices were intended to deny, and had the effect of denying,

equal access to home loans to residents of majority-Black and Hispanic communities and those seeking credit for properties located in those communities. Washington Trust's conduct was not justified by business necessity or legitimate business considerations.

75.    Washington Trust's actions as alleged herein constitute:

a.    Discrimination on the basis of race, color, and national origin in making available residential real estate-related transactions, or in the terms or conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulation, 24 C.F.R. §§ 100.110(b), 100.120;

b.    The making unavailable or denial of dwellings to persons because of race, color, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulation, 24 C.F.R. § 100.50(b)(3); and

c.    Discrimination on the basis of race, color, and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulation, 24 C.F.R. §§ 100.50(b)(2), 100.65.

76.    Washington Trust's policies and practices as alleged herein constitute:

a. A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act; and

b. A denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general importance.

77. Washington Trust's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

78. Persons who have been victims of Washington Trust's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of Washington Trust's conduct in violation of the Fair Housing Act, as described above.

## COUNT II: VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT AND REGULATION B

79. The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

80. Washington Trust's acts, policies, and practices as alleged herein constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority-Black and Hispanic communities in its assessment area and engaging in acts and practices directed at prospective applicants that would discourage prospective applicants from applying for credit on the basis of race, color, or national origin in violation of the Equal Credit Opportunity Act and Regulation B. 15 U.S.C. § 1691 *et seq.*; 12 C.F.R. § 1002.4(a)–(b).

81.    Washington Trust's policies and practices as alleged herein constitute a pattern or practice of discrimination and discouragement and resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, in violation of the Act. 15 U.S.C. § 1691e(h).

82.    Washington Trust's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

83.    Persons who have been victims of Washington Trust's discriminatory policies and practices are "aggrieved" as defined in 15 U.S.C. § 1691e(i), and may have suffered damages as a result of the Washington Trust's conduct in violation of the Equal Credit Opportunity Act, as described above.

## REQUEST FOR RELIEF

WHEREFORE, the United States prays that the Court enter an order that:

(1) Declares that the conduct of Defendant Washington Trust violates the Fair Housing Act;

(2) Declares that the conduct of Defendant Washington Trust violates the Equal Credit Opportunity Act and Regulation B;

(3) Enjoins Defendant, its agents, employees, and successors, and all other persons in active concert or participation with Defendant, from:

    A.    Discriminating on account of race, color, or national origin in any aspect of their lending business practices;

B.   Discouraging applicants on account of race, color, or national origin;

C.   Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendant's unlawful practices to the position they would be in but for the discriminatory conduct;

D.   Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendant's unlawful practices, and providing policies and procedures to ensure all segments of Defendant's assessment area are served without regard to prohibited characteristics;

(4) Awards monetary damages against Defendant in accordance with 42 U.S.C. § 3614(d)(1)(B) and 15 U.S.C. § 1691e(h);

(5) Assesses a civil penalty against Defendant in an amount authorized by 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

(6) Awards the United States any additional relief the interests of justice may require.

## DEMAND FOR JURY TRIAL

The United States demands trial by jury in this action on all issues so triable.

Respectfully submitted this 27th day of September, 2023.

**FOR THE UNITED STATES OF AMERICA:**

MERRICK B. GARLAND
Attorney General

ZACHARY A. CUNHA                          KRISTEN CLARKE
United States Attorney                    Assistant Attorney General
District of Rhode Island                  Civil Rights Division

CARRIE PAGNUCCO
Chief

/s/ Amy R. Romero                         /s/ Varda Hussain
AMY R. ROMERO                             VARDA HUSSAIN
KEVIN LOVE HUBBARD                        Special Litigation Counsel
Assistant United States Attorneys         Housing & Civil Enforcement Section
United States Attorney's Office           Civil Rights Division
District of Rhode Island                  U.S. Department of Justice
One Financial Plaza, 17th Floor           150 M Street, NE
Providence, RI 02903                      Washington, DC 20530
Phone: (401) 709-5010                     Phone: (202) 532-5036
Amy.Romero@usdoj.gov                      Varda.Hussain@usdoj.gov